BARBER ASPHALT PAVING COMPANY et al. v. FRANK G. HAYWARD et al., Appellants.

Division One, February 28, 1913.

1. STREET IMPROVEMENT: Completed After Absorption of City in Another: Tax Bill. Under Sec. 9743, R. S. 1909, Kansas City had power to issue a tax bill to the contractor in payment for a street pavement begun by Westport prior to the time it was merged into Kansas City by the extension of the city limits to include Westport, and completed after such merger.

2. ————: ————: ————: Rights Means Power. The word "rights" used in the statute declaring that if the extension of the corporate limits of a city includes the territory of another incorporated city "the corporate existence of such incorporated city, town or village so included in such extension shall, ipso facto, cease, and all property and rights of every kind and nature belonging to and vested in such incorporated city, town or village shall, by operation of law, at once pass to and vest in the city making the extension of its limits," etc., is broad enough to include "powers." One of the powers of Westport was to issue tax bills in payment of street paving, and the statute by vesting the "rights" of Westport in Kansas City vested the latter city, after the extension, with power to issue a tax bill in payment of a street improvement begun before, but not finished until after, the extension.

Paving Co. v. Hayward.

3. ————: ————: ————: **Ipso Facto Defined.** And *ipso facto* means by the fact itself; by, or as a result of, the mere fact or act.

4. ————: ————: ————: **Installment: Notice.** The property-owner, under the statutory charter of Westport (no ordinance being in evidence) had only an optional right to pay for street improvements by installments, and then only upon notice in writing to the city clerk that he chose to pay in three annual installments; and absent from the evidence any notice, in a suit by Kansas City on a tax bill issued after the work was completed and Westport was merged into Kansas City, the defendant property-owner cannot be heard to insist that the tax bills must be made payable in three annual installments, according to the statutory charter of .Westport, neither can he be heard to complain that Kansas City divided the tax into four annual installments bearing a less rate of interest.

5. ————: ————: ————: **Interest.** Where one city is merged in another, in the absence of any special legislative power in the latter to enact ordinances in pursuance to the statutory charter of the one which has become defunct and an integral part of the other, the latter may enact ordinances in pursuance to its own charter for the payment of a street improvement begun by the other before, but not completed until after, the merger. So where Westport contracted for a street pavement under a statutory charter declaring that special tax bills may bear eight per cent interest, and thereafter the corporate limits of Kansas City were extended to include the territory of Westport, whose property and rights thereby, under the statute, *ipso facto*, vested in Kansas City, and the improvement being thereafter completed, Kansas City had power to issue special tax bills against the abutting property to pay for the street improvement, in four annual installments, and, in accordance with its own charter, to provide that they should bear six per cent interest till due, and thereafter ten per cent until paid.

6. ————: ————: **Subject to Laws of Extending City.** If a city's limits be extended to include the territory of another incorporated city, the persons, lands and objects of taxation taken in, at once become subject to the general laws for levying taxes pertaining to the enlarged city, whether those taxes be general or special, and although the improvement for which the special taxation is levied was begun but not finished at the time of the extension.

7. ————: ————: **Special Assessment by Enlarged City.** If one city corporation has been annexed to a larger one, the officials of the enlarged city are the ones who have authority to levy assessments for a public improvement within the territory of the absorbed city; and the assessment is to be made

according to the charter of the enlarged city, if this differs from the law applicable to the one absorbed.

8. ————: ————: **Not Completed Within Time Specified by Ordinance: Extension.** Where the improvement ordinance made a call for the specifications and the contract made the same call and the contract was confirmed by a confirming ordinance, the contract, specifications and ordinances must all be read together for an ascertainment of their meaning as to when the work was to be completed; and where prior to the expiration of the time limit fixed in the improvement ordinance there is an extending ordinance, the extension is valid, and the tax bills are not invalid if the work was completed within the extended time.

9. **TAX BILL: Interest on Judgment: Ten Per Cent: Charter Provision.** Since the charter of Kansas City provides that tax bills for street improvement are to bear ten per cent interest after default, and judgments thereon are to bear the same rate, the charter provision controls, and not the statute declaring that all judgments except those on contracts shall bear six per cent. The judgment on such a tax bill should bear ten per cent interest. [Disapproving Barber Asphalt Paving Co. v. Field, 134 Mo. App. l. c. 668.]

Appeal from Jackson Circuit Court.—*Hon. Hermann Brumbach*, Judge.

AFFIRMED.

*Francis M. Hayward* for appellants.

(1) Kansas City had no power under its charter to issue any tax bill for any improvement except for such as was authorized by an ordinance of Kansas City and made under a contract let in pursuance thereof. Secs. 2, 3, 5 and 23, art. 9, Charter of 1889; Asphalt Pav. Co. v. Field, 134 Mo. App. 663; Dill. Munc. Corp. (5 Ed.), sec. 237. (2) Kansas City, by annexing Westport, assumed the liabilities of Westport, and was by statute given the power to issue Westport bills for work authorized by Westport. R. S. 1899, sec. 6399; R. S. 1909, sec. 9743; Paving Co. v. Field, 134 Mo. App. 663. (3) Westport, when it passed the ordinance and let the contract, under which the improvement in question was made, being a city of the fourth class, was

controlled by the general statutes governing such cities which provided for the issue either of one bill or three annual installments, such bills not to bear interest in excess of eight per cent per annum. R. S. 1899, secs. 5984 and 5987; R. S. 1909, secs. 9406 and 9408; Oster v. Jefferson City, 57 Mo. App. 485. (4) The bill in question not being in one bill or in three annual installments bearing interest at not exceeding eight per cent per annum, but in four installments and bearing interest at ten per cent per annum in case of default, is contrary both to the law governing cities of the fourth class and to the contract of Westport authorizing the work, and being in a proceeding *in invitum* such bill is void. Michael v. Mather, 172 Ill. 394; Kiley v. Oppenheim, 55 Mo. 374; Leach v. Cargill, 60 Mo. 316; Guinotte v. Egelhoff, 64 Mo. App. 356; Verdin v. St. Louis, 131 Mo. 26; Wolford v. St. Louis, 115 Mo. 139; Murnane v. St. Louis, 123 Mo. 479; Wheeler v. Poplar Bluff, 149 Mo. 36; Rove v. Trestrail, 62 Mo. App. 352; McQuiddy v. Brannock, 70 Mo. App. 535. (5) If Kansas City had power to issue the kind of bill sued on, such bill is void because the improvement was not completed till after the time fixed by the ordinance for doing the work had expired. Rose v. Trestrail, 62 Mo. App. 352; McQuiddy v. Brannock, 70 Mo. App. 535; Neil v. Gates, 152 Mo. 585; Barber v. Ridge, 169 Mo. 376; Smith v. Westport, 105 Mo. App. 221; Spalding v. Forsee, 109 Mo. App. 675. (6) The decree was erroneous in any view of the law, because judgment was rendered bearing interest at a rate of interest in excess of six per cent per annum. Asphalt Pav. Co. v. Field, 134 Mo. 663; Roofing Co. v. Fair Assn., 231 Mo. 589.

*Scarritt, Scarritt, Jones & Miller* for respondents.

(1) The plaintiff substantially complied with the terms of its contract as embodied in the contract and specifications between it and the city of Westport, and

the ordinance of Westport relating to the time of completing the improvement. Spalding v. Forsee, 109 Mo. App. 675; Independence to use v. Knepker, 134 Mo. App. 601; Becker v. Washington, 94 Mo. 375; Asphalt Pav. Co. v. Ullman, 137 Mo. 543; Litson v. Smith, 68 Mo. App. 397; Westport ex rel. v. Jackson, 69 Mo. App. 148; Strottman v. Railroad, 211 Mo. 227; State ex rel. v. Harter, 188 Mo. 516; Gist v. Construction Co., 224 Mo. 369; Whittemore v. Sills, 76 Mo. App. 248; Sparks v. Land Co., 99 Mo. App. 489; Hund v. Rackliffe, 192 Mo. 312; Jones v. Paul, 136 Mo. App. 524. (2) Kansas City had the power to accept the work and issue the tax bill in question to pay the contract price of the improvement. Sec. 9743, R. S. 1909; Art. 1, sec. 4, Kansas City Charter 1889; Page & Jones on Taxation by Assessment, sec. 245; Gilpin v. Ansonia, 68 Conn. 72; Manley v. Emlen, 46 Kas. 665; Eyerman v. Blakesley, 13 Mo. App. 407. (3) There is no merit in the defense that the judgment is erroneous because it was rendered at a rate of interest in excess of six per cent per annum. The judgment bears the same rate of interest as the tax bill, as provided in the Kansas City charter. Sec. 18, art. 9, Charter of 1889; Asphalt Pav. Co. v. Ullman, 137 Mo. 543; Buchan v. Broadwell, 88 Mo. 31.

LAMM, J.—Prior to December, 1897, Westport was a city of the fourth class. During that month, by proceedings unchallenged, its territory was taken into Kansas City and its corporate existence ceased, by virtue of the charter of Kansas City and the general statute. [R. S. 1909, sec. 9743; Charter of Kansas City of 1889, art. 1. sec. 4.] In September, 1897, by its ordinance, Westport required the paving of its street, known as Thirty-sixth street.

Extension of City Limits: To Include Corporated City.

Presently the Barber Asphalt Paving Company, as successful bidder, was awarded the contract and had begun per-

forming it when said merger took place. Presently, in 1898, the work was completed and accepted by Kansas City and by an ordinance of the latter a special tax was levied and assessed against abutting lots—one of them, the property of defendants. A tax bill issued to Paving Company was not paid and suit was brought thereon. From a judgment in its favor, defendants appeal.

The following propositions are maintained by appellants:

(a) The first proposition goes to the power of Kansas City, under its charter, to issue a tax bill for any improvements not authorized by an ordinance of Kansas City and let under a contract in pursuance of such ordinance. They affirm that cannot be validly done.

. (b) Their next three propositions are interdependent, their sum being this: Kansas City should have issued a "Westport tax bill" for work authorized by a "Westport ordinance." This, under the general statutes governing cities of the fourth class providing for eight per cent interest and not one drawing a greater interest as (it is alleged) the bill in question does; and providing either for one bill or three annual instalments, and not one payable in four instalments, as the bill in question does. Therefore the bill is void.

(c) Their next is that the bill is void because the work was not completed in the time fixed by the ordinance.

(d) Their final proposition is that the judgment was erroneous because it bears interest in excess of six per cent.

Sufficient record to present those propositions understandingly will appear in connection with the consideration of each, stated in our own way.

I. Had Kansas City, after the merger, the power to issue a tax bill for paving authorized by an ordi-

nance of Westport and let to a contractor prior to the merger?

In our opinion, yes.  This, because:

In section 9743, Revised Statutes 1909, anent extending the limits of cities with over 100,000 inhabitants, it is provided, among other things, that if the extension includes the territory of any incorporated city (as happened in this case) then "the Statute: corporate existence of such incorporated Tax Bill. city, town or village so included in such extension shall, *ipso facto,* cease, and all property and rights of every kind and nature belonging to and vested in such incorporated city, town or village, shall, by operation of law" (i. e., *ipso jure*) "at once pass to and vest in the city making such extension of its limits, and it shall be the duty of all officers and employees of such incorporated city, town or village having custody or control thereof, to surrender and deliver the same to such city so extending its limits; and such city shall also, by operation of law, become liable to pay all debts and liabilities of such incorporated city, town or village."

By the words, *"ipso facto,"* the lawmaker must be held to mean: By the fact or act itself; by, or as the result of, the mere act or fact; by the Ipso Facto mere fact; by the mere effect of an act Defined. or a fact.  [Bl. L. Dict., tit. *"ipso facto;"* Web., same title.]

The General Assembly, being presumably composed of scholars, is entitled to the presumption that it used those learned words in a scholarly sense; *ergo,* the lawmaker must be held to mean that the corporate existence of the city or town, whose territory is taken in by the extension of another city's limits, ceases at once by the mere fact or act of the extension of such limits.  By that *coup de grace* it, to all intents and purposes, is bereft of life and has left to it no power to be or do.  If appellants' position then be correct,

we have this anomalous and absurd situation: Kansas City can do nothing towards accepting the work in paving Thirty-sixth street or issuing tax bills, because unauthorized; Westport could do nothing after the act of extension, because it has no existence *de facto* or *de jure*. But if anything is to be done it must be done by one or the other. *Ergo,* nothing can be done at all in that behalf.

That specious syllogism recalls old Zeno's that one could not prove *motion* by reasoning. If a thing moves (he is said to have said) it must either move in the place where it is, or in the place where it is not. But it cannot move where it is, nor can it move where it is not. Therefore it cannot move.

Appellants' construction would be bound to result in distress and injury. But the law does not stand puzzle-headed and helpless before such practical difficulty. The inconvenience arising from such construction of the statute precludes adopting it, provided any other course be open in reason. *Argumentum ab inconvenienti est validum in lege.* There is another allowable construction which courts are called on to make, to-wit, that of construing the word "rights," in the quoted part of section 9743, as broad enough in meaning to include "powers." In Barber Asphalt Paving Company v. Field, 134 Mo. App. 663, such construction was arrived at on the inherent reason of the thing and on precedent. In that case an amended tax bill, issued by Kansas City, was in suit. The bill issued to take the place of an abortive one issued by Westport prior to the merger. It was contended the amended bill was void because unauthorized. But, in disallowing that contention, it was pointed out that under section 9743, Kansas City became bound for the debts and liabilities of Westport; that Westport was bound to issue a valid tax bill. If it failed to do so it became liable, and Kansas City, by succession under section 9743,

*[margin: Rights Means Powers.]*

itself became liable. To avoid the absurdity that a liability sprung without a corresponding power to discharge it by issuing corrected tax bills, the Kansas City Court of Appeals construed the word "rights" as inclusive of "powers;" and by reading that meaning into the statute, warrant of power was given Kansas City to issue the amended bill. We may adopt an apt exposition of acceptable doctrine from the opinion in the Field case. Speaking to the point, JOHNSON, J., says:

"Construing together all the provisions of the statute before us, the intent disclosed by them is to give to the word 'rights' the broader meaning of including not only property rights but also such municipal powers as were necessary to the performance of the obligations and the discharge of the liabilities legally assumed and incurred by the defunct city. Such meaning does no violence to the definition given to the word 'right' by lexicographers and courts. [Century Dict.; Webster's Dict.; 7 Words and Phrases Judicially Defined, p. 6220; People ex rel. v. Dikeman, 7 How. Pr. (N. Y.) 124.] In the case just cited, it is well said: 'The word "right" is defined by lexicographers to denote, among other things, property, interest, *power*, prerogative, immunity, privilege. [Walker's Dict., word "right."] In law, it is most frequently applied to property in its restricted sense, but it is often used to designate power, prerogative and privilege, and especially when applied to corporations. Indeed, a large proportion of the rights of political corporations consist of the powers conferred upon them.'

"The power to remedy the error and thereby to discharge the obligation of a contract which even the Legislature had no right to impair was one of the incidents of the rights granted to Kansas City by the statute. This conclusion is in accord with what was said by the St. Louis Court of Appeals in Eyerman

v. Blakesley, 13 Mo. App. l. c. 411, and is supported by every consideration of reason and justice."

The same conclusion springs from the general rule of law, viz., that where a duty is laid, or powers are granted, those incidental things necessary to do the duty or exercise the powers are implied. [State ex rel. v. Perkins, 139 Mo. l. c. 118.] The legal precept is: The incidents of a thing follow tacitly.

The point is ruled against appellants.

II. The related propositions ("b") relied on by appellants, may be put in asking form as one question, to-wit: Kansas City having the power to issue the tax bill (as just held) must it be issued in accordance with the detail requirements of the charter and ordinances of Westport, relating to interest and installments, or in accordance with the detail requirements of the ordinances and charter of Kansas City?

That inquiry seeks a statement of pertinent facts, as well as ordinance and statute and charter provisions, viz.:

There was no general ordinance of Westport regulating tax bill interest or installments read into the record. The special Westport ordinance providing for the pavement said nothing about either. In the contract, however, the contractor agreed to receive his pay in special tax bills (quoting) "against and upon the lands liable to be charged with the cost thereof as provided by law according to the charter and ordinances of said city." The contract went into effect October 25, 1897. On that date Westport passed an ordinance confirming the contract. At the date of both the original and confirming ordinances there were two sections of the statutory charter of cities of the fourth class, to which class Westport belonged (Art. 5, chap. 91, R. S. 1899), in force, to-wit:

248 Mo.—19

Section 5984, providing that special tax
Charter of    bills "shall be paid in the same manner
Westport.    *provided by ordinance.*" As to interest the
sections runs this way:

"Said special tax-bills may bear interest after
thirty days from the date of issue at the rate of eight
per cent per annum, and every such special tax-bill
shall be a lien against the lot or piece of ground de-
scribed in the same until the same is paid."

Section 5987, providing, *inter alia,* as follows:

"The total cost of paving, macadamizing, curbing,
guttering and the necessary excavation and grading
for the same, of any street, avenue, square or alley,
or other highway or any part thereof, may be paid in
three annual payments—one-third in one year, one-
third in two years and one-third in three years from
the date of issue of the special tax-bills—each payment
to bear not to exceed eight per cent interest per annum
from date of issue to date of payment: *Provided,*
that the owner of any lot or parcel of ground fronting
on such street, avenue, alley or other highway, or
square or part thereof improved, shall, within thirty
days after the letting of the contract for such work,
notify the city clerk, in writing, that he desires to pay
the same in three annual payments."

(*Note:* There is nothing in the record to show
that appellants notified the clerk of their desire to pay
in three annual installments.)

Turning to the pertinent parts of the charter and
ordinances of Kansas City and the terms of the tax
                bill in suit we have the following:  On
Kansas City    March 2, 1898, an ordinance (theretofore
Ordinance.    passed by both houses of the common
council of Kansas City) was approved, reading in
part:

"Section 1. That all the special tax bills to be is-
sued for paving and constructing streets under and
by virtue of the terms of the following ordinances of

the late city of Westport, to-wit: Ordinance No. 1959, 'An Ordinance to pave Thirty-sixth Street from the east line of Wyandotte Street to the west line of Holmes Street,' approved September 22, 1897, . . . be made payable in four equal installments and such tax bills, when issued, shall be payable and collectible as follows: The first installment shall become due and collectible on the 31st day of May next succeeding the date of issue of the tax bills, provided, that if such period is less than thirty days after the issue of the tax bills, then the first installment shall become due and collectible on the 31st day of May of the next year; the second installment shall become due and collectible in one year, the third installment in three years after the first installment is due and collectible, as above mentioned; provided, however, that the owner of the property charged with the payment of such tax bills or the owner of any interest therein shall have the privilege of paying the same in full at any time before the expiration of thirty days of the issue thereof; and provided further that the owner of the property charged with the payment of such tax bills, or the owner of any interest therein, shall have the privilege of paying such tax bills in full at any time by paying all interest thereon to a period ninety days after the date of such payment, unless such payment is made within less than ninety days of the maturity of the next installment, and then by paying interest thereon to the date when the next installment becomes due and payable. Such tax bills, including each installment thereof, if not paid in full before the expiration of thirty days from the date of the issue thereof, shall bear interest from the date of issue at the rate of six per cent per annum, and when any installment becomes due and collectible as herein provided, interest thereon and on all unpaid installments shall be due and collectible to that date. If any installment of any such tax bills or interest thereon be not paid when

due, then all the remaining installments shall immediately become due and collectible together with interest thereon at the rate of ten per cent per annum from the date of issue of such tax bills, less the sum of any interest that may have already been paid on said installments.

"Section II. All the provisions of the charter of Kansas City in regard to the payment and collection of installment tax bills issued for the paving of streets, shall apply to and govern the payment and collection of the bills referred to in section one of this ordinance as fully and with the same effect as though the work in payment for which the said tax bills may be issued had been authorized by charter, ordinances and con-- tracts of Kansas City, Missouri."

(*Note*: Appellants do not contend that the scheme outlined in the foregoing ordinance does not accord with the Kansas City charter scheme outlined in section 25, article 9 of the Kansas City Charter of 1889. Hence, the charter provisions are omitted.)

On May 25, 1898, an ordinance of Kansas City was duly approved, narrating that the work of paving Thirty-sixth street "in the late city of Westport" had been approved and accepted, etc., and the cost apportioned. It then went on to levy a special assess-, ment against abutting property, and special tax bills were ordered to issue.

The record shows that the tax bill sued on ran in the terms provided by said ordinance of Kansas City, approved March 2, 1898.

On such record we make these observations:

(1) *Of installment payments.* If Westport had charter power under Revised Statutes 1899, section 5984, supra, to pass a general ordinance providing for unconditional installment payments of special tax bills (a point we do not decide), it did not exercise that power on this record. Turning to section 5987,

Revised Statutes 1899, supra, a part of the charter of
fourth class cities, it does not require installment pay-
ments whether or no. The words of the law are per-
missive, not impelling. The statute says tax bills "*may
be* paid in three annual payments," not that they *shall
be*. And this favor runs only on a proviso, an un-
qualified condition precedent, to-wit, that within thirty
days after letting the contract the lot owner notify the
city clerk in writing of his desire to pay in three an-
nual payments. Observe, there can be no two ways
about it but that, under that section, the lot owner has
merely an installment privilege, an option—an option
conditioned only on a notice. We do not say that under
this record appellants would have had vested rights
in the privilege of three installments. But we do say
that whatever rights they may have had on giving
such notice, yet absent proof of such notice, as here,
they cannot be heard to complain, as they do, that the
payment installments were made four instead of three.
Evidently if they lost the right to demand three, or
any at all, they have no cause to complain that their
resulting burden was eased off by division into four
parts. We let the point break on the view just pre-
sented, because it is determinative of the question, not
because there are not other allowable views equally
decisive.

(2) *Of interest.* On this record there was no gen-
eral or special ordinance of Westport regulating inter-
est on tax bills issued for street improvements. We
do not stop to consider or decide whether such ordi-
nance was necessary before appellants could be heard
to complain that the tax bill rate of interest was er-
roneous. For the purpose of getting an accurate view
of the point in hand, we go to the provisions of the
statutory charter of cities of the fourth class. Ob-
serve section 5984, supra, says special tax bills "*may*
bear interest after thirty days from the date of issue

at the rate of eight per cent per annum.'' The word "may" imports power to use a sliding scale. We shall assume that under that statute a city of the fourth class could not issue tax bills drawing a greater rate than eight per cent, but might issue bills drawing less. At the trial appellants objected to the tax bill and to the ordinance of Kansas City relating to the levy of the special assessment for the improvements of Thirty-sixth street, on the ground that the rate per cent of interest impaired the obligations of a *contract*. We do not say one way or the other as to appellants' standing to make such point, but we do say this: If that objection be still shadowed forth in appellants' brief (a point faint, if made at all), it certainly cannot be construed to mean that appellants had a vested or contract right that the tax bills should not bear a *less* per cent than eight. Now, the tax bill in suit bears six per cent after thirty days from the date of issue and this six per cent runs until default in payment noticed in the tax-levying ordinance, and then it becomes ten per cent under that ordinance and the charter of Kansas City. In reason, therefore, appellants' contention must be held to mean that they complain of the two per cent of excess above eight, after default, and not on the two per cent of deficit under eight, before default.

With the contention narrowed down to that excess, we confront the crucial and ultimate question, viz.: After the merger, with the work of improvement of Thirty-sixth street mid-way in progress but not completed, is Kansas City to proceed with the special assessment levy to pay for the improvement in accordance with laws that once governed Westport, or in accordance with the charter of Kansas City in force when the time came to make the levy and issue the bills?

No one would question the legislative power to provide in the enabling statute, permitting one city to

take in the territory of another, that, in case there were uncompleted street improvements at the time of the merger, the laws governing the resulting city should obtain in special levies made by the resulting city to pay for such improvements completed after the merger. It is unfortunate that the enabling statute (R. S. 1909, sec. 9743, supra), when it provided for the corporate death of Westport, did not, by a stroke of the pen, clear up that question and not leave the matter in doubt to be determined by judicial construction.

The Supreme Court of New Jersey confronted a like situation in Minhinnah v. Haines, 29 N. J. L. 388, wherein VREDENBURGH, J., aptly said: "It is one of those instances of hasty legislation so frequently met with, and through the quicksands of which we can only steer by sounding at every step."

The question being nice, is not without difficulty. In a very late edition of a treatise (1 Lewis, Em. Dom. [3 Ed.], sec. 383), its author, speaking to a related question, says:

"Municipalities frequently put off one form of government for another, whereby radical changes are made in the form of government. Towns and villages become cities. One law of incorporation is exchanged for another. The laws under which such changes are made frequently do, and always ought, to make provisions for all pending suits and proceedings and all accrued rights and liabilities in such a way as to prevent confusion or loss. But sometimes this is not done, and the question arises, what would be the effect of such a change upon pending proceedings for condemnation? It would be difficult to lay down any general rule for such cases," etc.

Absent a controlling decision of our own, the question is to be determined on the inherent reason of the thing, on general principles, and the sources of a sound judgment are to be looked for in persuasive case-law

and deduced by parity of reasoning. The assignment of error in hand must be overruled, because:

(a) We have already determined (paragraph one) that Kansas City had power, under the enabling act, to issue the tax bill. The reasoning sustaining that ruling lends countenance to the conclusion just announced. It is but taking another step and why should we halt when reason points to an advance?

Moreover, the levy of the special assessment, *ex necessitate rei,* must follow the completion and acceptance of the work. Now, when those stages were reached for action Westport had become an integral part of Kansas City. Westport having *"ipso facto"* ceased and become a mere memory, we know of no general principle of law authorizing one municipal corporation to enforce the laws of another in existence, let alone a defunct one—absent express legislative power to that end. Accordingly if Kansas City can make the levy at all, it would seem her warrant of authority to do so must be looked for in her own charter and ordinances.

**Powers of Absorbing City.**

Again, it requires no citation of authority to show that if a city's limits be extended, the person, lands and objects of taxation taken in, at once become subject to the general laws for levying taxes pertaining to the enlarged city. Thus, if A owns a farm, included by an extension ordinance into a city, that farm may thenceforward be taxed not only for current municipal purposes but to pay the prior bonded debt of the enlarged city. If, then, the territory taken in at once becomes subject to laws pertaining to the levy of general taxes, we see no insuperable objection to taking another step in the same direction, to-wit, to hold that a subsequent levy of special assessments is governed by the laws of the resulting city. It has been held that a drainage district may be enlarged by the addition of new territory, and the new territory then sub-

jected to the burden of assessments to pay the prior bonded indebtedness of the original district. [Squaw Creek Drain. Dist. v. Turney, 235 Mo. 80; Des Moines, etc., Levee Dist. v. Railroad, 240 Mo. 614.] It has been held where the scheme of taxation for the payment of bonds to be issued by a drainage district was changed after the district had been organized and while steps were being taken heading to a bond issue, mandamus would go to compel the issue of the bonds despite the changed scheme for paying them. [State ex rel. v. Chariton Drain. Dist., 192 Mo. 517.]

Again, it destroys no vested right if, pending a proceeding in court, the remedial procedure is changed and so far as practicable the proceeding is continued under the changed law. [State ex rel. v. Taylor, 224 Mo. l. c. 464; Clark v. Railroad, 219 Mo. l. c. 532, et seq.] It is not a far-fetched analogy to take the extension of the limits of Kansas City during the life and execution of an improvement contract, in broad principle, as the same as changing a remedial procedure pending a proceeding in court, since the two per cent excess of interest above eight per cent is (in a sense) a mere remedial spur to provoke prompt payment.

Finally, the whole subject is to be ruled with this view in mind: It is a great mistake to suppose that courts approach special assessments for street improvements with a frosty air or look at the incidental hardships of them as something inherently suspicious or wrong (Gist v. Construction Co., 224 Mo. l. c. 378, et seq.; Paving Co. v. Ullman, 137 Mo. l. c. 568); or to suppose that the wit of man is adequate to invent any scheme of special or general taxation so ideally perfect as to be invulnerable to shafts of criticism. [Brunn v. Kansas City, 216 Mo. 108, l. c. 120.]

With which pertinent general comments, we pass to a closer view.

(b) "If a public corporation has been annexed to a larger one, or has been dissolved and has become

a part of an incorporated township, the officials of the corporation into which it is thus merged are the ones who have authority to levy assessments within the territory of such former corporations. The assessment is to be made according to the charter of the resulting city if this differs from the law applicable to the original corporation." [1 Page and Jones, Taxation by Assessment, p. 377.]

On that decisive proposition this case must ride off. It is directly supported by Gilpin v. Ansonia, 68 Conn. 72; Manley v. Emlen, 46 Kan. 655; and, *arguendo,* in Eyerman v. Blakesley, 13 Mo. App. 407; State ex rel. St. Joseph Waterworks v. Geiger at al., 246 Mo. 74. We think it finds some little support inferentially in Adams v. Lindell, 5 Mo. App. 197, and St. Louis v. Stoddard, 15 Mo. App. 173.

The mere fact that the improvement contract contained the provision that the contractor agreed to receive his pay in tax bills issued "as provided by law according to the charter and ordinances of said city" (Westport), has no virtue in judicially determining the point in hand, because: In the first place there are no pertinent ordinances in evidence. In the second place that provision, so far as it relates to Westport's charter, adds not a whit to the contract; for the statutes constituting the charter would have been read into the contract for all legitimate purposes, absent the provision. So that, in last analysis, the question resolves itself back to a construction of those statutes, and the further question: Which laws were in force after the merger when the assessment levy was made? Both of which have been ruled.

It is on premises thus announced, we rule the point against appellants.

III. Is the bill void, as argued, because the work was not completed in the time fixed by the original Westport ordinance?

That question seeks more of the record, to-wit:

Shortly, the improvement ordinance, after providing the work should be done in strict conformity with the plans and specifications therefor, on **Completion of Work.** file in the office of the city engineer, then went on to provide that it should be completed within four months from the time the contract therefor binds and takes effect. When we go to the plans and specifications so on file, as the call in the ordinance commands, we find they provide that the work should be commenced within sixty days after the contract takes effect and is to be completed within four months. But the specifications on which the work was let do not stop there. There is another provision to the effect that if the work be not completed within four months then $10 *per diem* should be deducted for every working day over the four months. And the further provision that no such allowance should be made unless the contractor be delayed from prosecuting the work, or unless the time be extended by the passage of an ordinance. Further, there is a provision that these specifications should be understood to be a part of the contract. There is still another specification to the effect that days' work lost in consequence of court proceedings, bad weather, grading, curbing, trenching, by other contractors over whom the contractor had no control, by strikes, etc., shall be added to the four months for the completion of the work. And still another to the effect that when the temperature was such that in the opinion of the engineer it would hinder the concrete in setting, concrete should not be laid.

The improvement contract also contained a call for these specifications and required the work to be done in accordance therewith. As already noticed there was an ordinance passed by Westport confirming this contract on the date it was executed.

Presently, in November, 1897, Westport passed

another ordinance commanding the curbing of Thirty-sixth street on both sides. A contract to do that curbing was let to another party and caused some delay in paving. The weather also caused delay because the temperature was too low to allow concrete to set. The case is put to us in such fashion that if those delays may be deducted from working days the work was finished within the original ordinance time of four months. Otherwise, otherwise. However, by an ordinance of the common council of Kansas City, passed after the merger and before the strict ordinance four months were up, the time was extended for a period of sixty days. All hands agree the work was completed on the 30th day of March, 1898, within the extended time.

On such record, we observe:

Our reports are full of exposition on the effect of contracts and ordinances apparently conflicting on the question of time limit for doing public work. In some cases ordinances have been silent on time, and the contracts have spoken. In some cases there are conflicts in the terms relating to time. In some cases there has been an ordinance time limit and then a penalty has been provided for violating the limit. So, in some cases there has been no extension ordinance. These questions have all received judicial attention and been resolved, not without some discord.

We shall not prolong this opinion by marshaling those cases, pointing out the distinctions made whereby one has been differentiated from another, nor shall we sum up the holding of each separate case. We proceed to judgment by announcing our conclusions to be that where the improvement ordinance made a call for the specifications and where the contract makes the same call and the contract is confirmed by a confirming ordinance, then the contract, the specifications and ordinances must all be read together for what they are worth. And the further conclusion that where

prior to the expiration of the time limit fixed in the improvement ordinance there is an extending ordinance, the extension is valid. Cases supporting those conclusions are cited by respondents' counsel and will appear in our reporter's headnotes. The statutory charter for cities of the fourth class require contracts for street work to be let on plans and specifications duly filed. [R. S. 1899, sec. 5989.] We mention this to show the significance of the call made in the ordinance and in the contract for the specifications. In Hund v. Rackliffe, 192 Mo. l. c. 324-5, the following controlling doctrine is announced, viz.:

"No good reason has been given, or is conceivable, why the municipal assembly should not have power to extend the time for the completion of a contract beyond the period specified therefor in the original ordinance, if the extending ordinance is passed prior to the expiration of the time limited in the original ordinance; and likewise no good reason appears why the municipal assembly should not have power to extend the time under such circumstances, when no time was specified in the original ordinance and the time limited was specified only in the contract."

The point is ruled against appellants.

IV. Appellants' motion in arrest raises the question: Is the judgment erroneous for that it bears ten per cent. interest instead of six per cent? The question is presented in their briefs as a live one.

By Revised Statutes 1909, section 7181, interest on judgments on contracts runs at the same rate borne by such contracts. All other judgments bear

**Judgment: Rate of Interest.** six per cent. from rendition until satisfied. By the charter of Kansas City of 1875, special tax bills for street improvements (after default) bore fifteen per cent. per annum and the charter required judgments thereon to bear the same rate. [Art. 8, sec. 4.] By the freeholders' char-

ter of 1889, in force when the Thirty-sixth street levy was made, tax bills (after default) bore ten per cent. interest and judgments thereon bore the same rate. [Art. 9, sec. 18.]

Under the charter of 1875, this court held that a judgment on a special tax bill should follow the charter and bear the same rate as the tax bill, to-wit, fifteen per cent. [Buchan v. Broadwell, 88 Mo. 1. c. 37.]

In Dickey v. Porter, 203 Mo. 1. c. 39, we held, In Banc, that a judgment on tax bills under section 18, article 9, of the charter of Kansas City of 1889, bore ten per cent. Such judgment was affirmed in that case.

Under the same charter, the Kansas City Court of Appeals held that a judgment on such tax bill should bear only six per cent. interest. [Barber Asphalt Paving Company v. Field, 134 Mo. App. 1. c. 668-9.]

The question is: Shall we follow our own ruling, or, on reconsideration, follow that of the Kansas City Court of Appeals? We have aid of little light from briefs on either side. The point is treated as a minor one and left unreasoned.

In Brunn v. Kansas City, 216 Mo. 108, the question was: Should the general statutory provision for interest at six per cent. on judgments obtain, or, *contra,* the provision of the Kansas City charter requiring judgments for damages in condemnation proceedings to bear no interest at all pending appeal? We ruled on full deliberation (on full briefs on the point) that the charter controlled. Hence such judgment, pending appeal, bore no interest despite the general provision of the statute. It is impossible to distinguish the Brunn case from that at bar on principle, and that case was grounded on our repeated adjudications on the scope, force and effect of that charter.

When closely read there is nothing in Gilsonite Roofing & Paving Company v. St. Louis Fair Associa-

tion, 231 Mo. 589, to the contrary. It was ruled there that a judgment on a special tax bill was not a judgment on a contract and, therefore, absent a charter provision, under the general statute such judgment would not bear the interest borne by the tax bill, but would bear only six per cent. But, as pointed out in the opinion, that ruling was based on a tax bill issued under the charter of St. Louis, having no provision relating to the rate of interest a judgment on such bill should bear. Furthermore, in the Gilsonite case the Dickey-Porter case was differentiated because of the peculiar charter provisions of Kansas City now up for consideration. The attention of this court was not called to the Brunn case nor is it mentioned in the Gilsonite case, though a constitutional question, based on section 16, article 9, of the Constitution, requiring the charter to be "consistent with and subject to the Constitution and laws of this State," is mentioned, though not decided. Boonville ex rel. v. Stephens, 238 Mo. 339, l. c. 359, followed the Gilsonite case.

In the Brunn case, however, that very constitutional provision was in judgment, as the pivotal question in the case, resulting in a holding that Kansas City, having power to adopt a charter on municipal affairs, its provisions thereon controlled, despite the general statute on interest. The reasoning of the Brunn case has been approved in a banc case just handed down. [State ex rel. v. Seehorn, 246 Mo. l. c. 557.] We can add nothing to what was there said.

In St. Joseph ex rel. v. Forsee, 110 Mo. App. 237, a statute (the charter of cities of a certain class) was involved requiring a judgment on a tax bill, issued by St. Joseph, to carry fifteen per cent. It was there ruled that the word "interest" in that statute was a misnomer and meant "penalty" in that connection and a line of cases is cited that bears out that theory, at least *as to "interest" on the tax bill itself*. The

Forsee case controlled that court in its disposition of the Field case.

We are not favored with a brief on the constitutional question, as such, and see no reason for repudiating the doctrine of the Brunn, Dickey-Porter and Buchan-Broadwell cases. *Stare decisis.*

Let the judgment be affirmed. It is so ordered. All concur.